UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SUSAN GRUND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-00096-TWP-MJD |
| ) | |
| CORIZON, JULIE MURPHY, and ) | |
| DR. DAVID HINCHMAN, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Corizon (Health Services, Inc.) ("Corizon"), Julie Murphy ("Murphy"), and Dr. David Hinchman ("Dr. Hinchman") (collectively, the "Defendants"). Plaintiff Susan Grund ("Grund"), an Indiana inmate, formerly confined at the Indiana Women's Prison ("IWP"), brings this action pursuant to 42 U.S.C. § 1983 alleging the Defendants were deliberately indifferent to her serious medical needs. Specifically, Grund alleges she was improperly denied testing, including an MRI, to determine if she is suffering from complications related to her breast implants. She also alleges that she was improperly cleared to work a strenuous prison job. The Defendants have moved for summary judgment and Grund has responded. For the following reasons, the Defendants' Motion for Summary Judgment (Filing No. 36), is **granted**.

## I. STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTS

The statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Grund as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). The facts presented are those material to Grund's claims regarding her job assignment within the prison and the necessity of testing for breast implant complications.

**A.** **Julie Murphy**

Defendant Murphy is the Health Services Administrator at IWP. During the time relevant to the Complaint, she was employed by Corizon, the prison medical provider which contracted

with the Indiana Department of Correction to provide healthcare to Indiana prisoners. As the Health Services Administrator, Murphy is responsible for ordering medical supplies for the facility, hiring medical staff, maintaining the nursing staff schedule, responding to offender grievances regarding medical issues, and dealing with human resources issues for the medical staff. She occasionally treats offenders if the medical team is short-staffed or if there is an emergency or a difficult medical issue. Murphy was not involved in Grund's day-to-day medical assessment and treatment; rather, the decisions regarding Grund's course of treatment were made by doctors and nurse practitioners.

Grund wrote a letter to Murphy on December 30, 2015, stating that she had been reclassified from a non-laborious job as a game clerk to a laborious job as a porter. Grund requested that Murphy provide her medical verification and/or medical restrictions so that Grund could be reclassified to a non-laborious job. Murphy referred this matter to a doctor because the doctor is the only person who can recommend that an inmate be reclassified to a different job classification based on a medical condition. Murphy never submitted a job request for Grund to be assigned to any particular job at the prison. As the Health Services Administrator, Murphy cannot assign an inmate to a prison job; that is done by the prison administration. The only involvement Murphy has with the job assignment process is to confirm whether or not an inmate has a medical condition that prevents her from performing a particular prison job.

Grund saw Dr. Sackett regarding her job assignment, however Dr. Sackett told her to speak to Murphy. Grund then spoke personally to Murphy, who stated that she would tell Dr. Sackett to write a restriction order. In addition, over the years there have been occasions when Murphy has responded to Grund's requests for healthcare. If Grund submitted a Request for Healthcare form

3

that asked a question or sought specific information, rather than asking for specific medical treatment, then Murphy might be the one to respond to such a request. Murphy has also ordered new batteries for Grund's hearing aid. Grund sent Murphy a letter on February 10, 2015, regarding a list of vitamins and eyeglasses that she wanted. Murphy forwarded this letter to Dr. Malola to determine if Grund could have the items she requested and forwarded the response back to Grund. However, Murphy made no decision regarding Grund's requests.

**B.  Grund's Breast Implants**

Grund had breast implants prior to coming to prison. In July 2010, her implants were replaced because they had ruptured and were leaking. Grund arrived at the IWP in 2012. While at IWP, she saw Dr. Raines because she was experiencing a tightening sensation in her breasts. He prescribed a "detox" treatment. This treatment alleviated the tightening for a while, but the sensation returned after a few months. Dr. Raines referred Grund to Dr. Hinchman, who at that time was the provider of gynecological services for inmates at IWP, including their yearly gynecological examinations.

Dr. Hinchman examined Grund on October 16, 2013. Grund reported breast discomfort that began after her breast surgery. She reported that she always had discomfort along the outer sides of both breasts. Dr. Hinchman noted that subsequent breast examinations and mammograms after her surgery were normal and unremarkable. Grund's vital signs were within normal limits. Dr. Hinchman performed a physical examination of Grund's breasts. Her breasts appeared to be symmetrical and the skin surface of both breasts was normal to inspection and palpation. Grund expressed mild tenderness to palpation along the outer sides of both breasts. There were no palpable masses in the tissue of either breast. Grund states that her pain had lessened at this time

4

because of the detox treatment. Dr. Hinchman's examination of Grund's breasts was normal and he felt no physical abnormalities in her breasts. Dr. Hinchman's plan was for Grund to continue monthly breast self-exams and to return as needed.

On September 17, 2014, Grund had a mammogram, which was normal. Grund was concerned that if her new implants had ruptured, the mammogram would cause more damage, but she did not refuse the test. Grund experienced considerable pain during and after the mammogram. In October of 2014, she submitted a healthcare request to see a doctor for her breast pain. She saw Dr. Malola who told her she could not do anything for her pain, but discussed the possibility of another detox treatment.

Dr. Hinchman's first examination of Grund in 2015 was on July 10, 2015. During that examination, Grund reported a dull achy sensation in both breasts that she said was "chronic" since she had her breast implants replaced in 2010. According to Dr. Hinchman, while Grund said she was currently experiencing symptoms, she did not appear to be in acute distress. Grund states that Dr. Hinchman asked her only if she showers and washes her hair and she replied that she did, but not without pain. She informed Dr. Hinchman that she was unable to participate in exercise, activities, or work at any job that requires the use of her arms or upper body. She did not have uninterrupted or painless sleep. Grund reported that twice a year she had episodes of redness and warmth in the skin of each breast that was not in both breasts at the same time. However, she said she was unable to go to the health care unit during those episodes because, outside of emergences, prisoners are not allowed to see medical staff without being called to the health care unit and health care requests take days to process. Grund did show the inflammation once to Dr. Malola, but by then it was not as inflamed as it had been at onset.

Dr. Hinchman noted that Grund's last mammogram in September 2014 was normal, as was her recent lab work. He examined Grund's breasts while she was laying on her back and while she was sitting with her arms at her sides. Her breasts appeared symmetric with no skin dimpling. Dr. Hinchman noted no inflammation or tenderness to palpation in either breast. Grund testifies that his examination was too gentle to trigger her to "cry out" in pain. Her implants were in place and were symmetric, mobile and non-tender to movement on palpation. Her nipples were normal with no discharge. Dr. Hinchman's objective findings did not corroborate Grund's reported symptoms of pain. His plan to monitor Grund's breasts was for her to do monthly self-breast exams, for the provider to do an annual examination, and for an annual mammogram. Dr. Hinchman or the provider at the prison could also do a breast examination as needed or upon request. Dr. Hinchman advised Grund to seek medical attention the next time she experienced anything abnormal such as inflammation. Dr. Hinchman concluded that there was no indication for an MRI at that time.

The Defendants have submitted an affidavit from Dr. Charles Zollman, who has extensive experience in breast augmentation, including breast implants. Dr. Zollman states that physical examination of the breasts is the best way to tell if there is a problem with an implant. With normal findings upon a physical examination, there is no indication for any diagnostic testing such as an MRI. After the post-operative period, there is no requirement that a patient undergo any type of regularly scheduled monitoring of breast implants.

Grund asserts that blood tests in 2015 indicated that she had high levels of anti-nuclear antibodies ("ANA"). She concludes that this result demonstrated that her body was rejecting a foreign substance – either the silicone breast implants themselves or the presence of free-flowing

silicone. According to Dr. Hinchman, Grund's positive ANA screen suggested she had an autoimmune disorder, which is why she was tested for lupus and several other conditions and she was eventually diagnosed with Celiac disease. Dr. Hinchman concludes that Grund's subsequent diagnosis of Celiac disease is consistent with her positive ANA screen and other abnormal lab values, as well as her complaints of weight loss and gastrointestinal issues and not related to her breast implants. In addition, Dr. Hinchman opined that Grund's past chronic complaints of weight loss, fatigue, and gastrointestinal issues are consistent with her eventual diagnosis of Celiac disease.

### III. DISCUSSION

The Defendants seek summary judgment on Grund's claims. They argue that claims based on actions that took place in 2013 are barred by the statute of limitations and that they were not deliberately indifferent to her serious medical needs. Defendant Corizon also argues that it does not maintain a policy and practice that resulted in any violation of Grund's constitutional rights.

#### A. Statute of Limitations

Defendants first argue that any claim based on treatment that took place in 2013 is barred by the statute of limitations. Suits under Section 1983, such as this one, use the statute of limitations and tolling rules that states employ for personal-injury claims. In Indiana, the applicable statute of limitations period is two years. *See Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Ind. Code § 34–11–2–4. Grund claims, in part, that Dr. Hinchman denied her a referral to a specialist and denied her diagnostic testing in October, 2013. Based on the applicable statute of limitations, she had through October 2015, to file a lawsuit based on these facts. But she filed this case nearly three months later, in January 2016. Any deliberate indifference claim based

on medical care received in October 2013 is barred by the statute of limitations and the Defendants are therefore entitled to summary judgment on these claims.

B. **Deliberate Indifference**

The Defendants next argue that they were not deliberately indifferent to Grund's need for medical treatment. Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) she suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

Murphy and Dr. Hinchman do not argue that Grund's asserted condition is not a serious medical condition, rather they assert they were not deliberately indifferent to her condition. "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See also Plummer v. Wexford*

8

*Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

1. **Murphy**

Grund claims in her Complaint that Murphy medically cleared her to work at a strenuous prison job and denied her grievance regarding her medical care. Murphy argues that she was not deliberately indifferent to Grund's medical condition because she had no role in the decisions regarding Grund's medical treatment or job assignment.[1] Murphy asserts that when Grund requested a change in her job classification, she forwarded the request to a doctor. Grund asserts that she spoke to Dr. Sackett regarding her job assignment, and he told her to speak to Murphy. She then spoke personally to Murphy, who stated that she would tell Dr. Sackett to write a restriction order. The parties' versions of the events are not materially inconsistent. It is undisputed that Murphy referred Grund's request to a doctor and that the doctor did write a restriction order. In so doing, Murphy did not ignore a risk to Grund or fail to respond

---

[1] Grund contends that Murphy "involved herself" in her medical care in 2013, but as discussed above, any claim based on medical care received in 2013 is barred by the statute of limitations. Further, these allegations, based on acts that took place in 2013, are insufficient to raise an inference that Murphy participated in making medical decisions for Grund in 2015.

9

appropriately to her complaints. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm). In addition, there is no evidence that Murphy had any role in Grund's initial assignment to a more strenuous job. *See Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (a defendant can only be liable for the actions or omissions in which he personally participated). Grund therefore has not presented any evidence to support a conclusion that Murphy was deliberately indifferent to her medical needs regarding her job assignment.

Grund further asserts generally that Murphy was always involved in her medical care and that she had to submit her medication requests to Murphy. But Grund's general conclusions about Murphy's involvement in her medical care are insufficient to create a genuine issue of material fact. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Further, the fact that Grund had to submit certain medical requests to Murphy does not dispute the facts, presented by Murphy, that she receives and processes requests regarding inmate medical care, but does not make medical decisions. Grund thus has presented no evidence that Murphy made any decision regarding Grund's request for treatment for her breast implants.

In sum, it is undisputed that Murphy played no role in Grund's job classification other than to process her request for a re-classification after she had been assigned a physically strenuous job. It is further undisputed that Murphy did not make the medical decisions related to Grund's complaints in this case. Murphy is therefore entitled to summary judgment on Grund's claims.

### 2. Dr. Hinchman

Grund alleges that Dr. Hinchman has been deliberately indifferent to the potential breast implant complications she believes she has experienced, including her associated pain. The only time Dr. Hinchman saw Grund during the time relevant to the Complaint and not barred by the statute of limitations was on July 10, 2015.[2] At that visit, Grund expressed that she was experiencing breast pain. Dr. Hinchman examined her breasts while she was laying on her back and while she was sitting with her arms at her sides. Her breasts appeared symmetric with no skin dimpling. There was no inflammation or tenderness to the touch. Her implants were in place and symmetric, mobile and non-tender to movement or palpation. Grund also reported to Dr. Hinchman that she occasionally had episodes of redness and warmth in the skin of her breasts, but she was not able to get a medical appointment before the flare-up would begin to diminish.

Based on his examination and discussion with Grund, Dr. Hinchman concluded that her breasts were normal. His plan was for her breasts to be monitored through monthly self-exams, annual examinations by the provider, and an annual mammogram. Dr. Hinchman or the other providers could also do a breast examination as needed upon request. He also advised Grund to seek medical attention the next time she experienced anything abnormal such as inflammation. Dr. Hinchman did not conclude that Grund needed an MRI at that time. Dr. Zollman has testified that the best way to evaluate breast implants is by physical examination, and that a physical examination consisting of soft breasts, without hardness or infection, is an indication of normal

---

[2] Ms. Grund alleges in her Complaint that she saw Dr. Hinchman in January 2015, but there is no evidence in her medical records of this visit and she does not argue in response to the motion for summary judgment that he examined her at that time.

breast. Diagnostic tests, such as MRIs, are not indicated when there is no abnormal physical examination. Further, routine MRIs are not necessary after breast implant surgery.

Grund states that rupture of the implants is a potential complication of breast implant surgery and that Dr. Hinchman failed to consider this potential complication. But this conclusion is not supported by the record. As already discussed, Dr. Hinchman thoroughly examined Grund based on her complaints of pain and the physical examination was normal. The undisputed evidence here is that when a physical examination is normal, no further testing is indicated.

Grund further argues that blood test results in October 2015 indicate the presence of leaking silicone. But it was not unreasonable for her medical providers to conclude that Grund's blood test results indicated the presence of Celiac disease and not silicone in her system, especially considering her history of gastrointestinal problems. Grund's disagreement with the conclusion that she has Celiac disease is not evidence to show deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and [her] doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Grund also argues that an ultrasound report from 2011 shows the need for further testing. But she is not qualified to interpret that report and has failed to present evidence or argument to connect any findings from that report to her complaints at issue here, which took place in 2015.

In sum, Grund has failed to present evidence to raise an inference that Dr. Hinchman was deliberately indifferent to her serious medical needs. She went to him complaining of breast pain and he performed a thorough examination. His examination indicated that her breasts were normal and the examination did not corroborate her complaints of pain. Dr. Hinchman recommended that

Grund perform monthly self-exams and noted that she could request an examination from him or another medical provider. In these circumstances, the standard of care did not require him to order an MRI or do anything further. In other words, Dr. Hinchman exercised sound medical judgment that, according to Dr. Zollman, was within the standard of care. *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."). Dr. Hinchman is therefore entitled to summary judgment on Grund's claims.

### 3. Corizon

The Defendants also seek summary judgment on Grund's claim against Corizon and her claims against Murphy and Dr. Hinchman in their official capacities. Because Corizon acts under color of state law by contracting to perform a government function, *i.e.,* providing medical care to correctional facilities, it is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc*., 300 F.3d 760, 766 fn.6 (7th Cir. 2002); *but see Shields v. Illinois Department of Correction*, 746 F.3d 782, 790 (7th Cir. 2014) (finding "substantial grounds to question the extension of the *Monell* holding for municipalities to private corporations"). "To establish municipal liability [in a Section 1983 claim], a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind

the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833-34 (7th Cir. 2012).

To support her claim of an official policy or custom sufficient to make Corizon liable for the alleged deliberate indifference to her medical needs, Grund asserts that Corizon doctors must submit requests to Corizon's main office for approval of medication or visits to specialists. But even assuming such a policy exists, this does not show deliberate indifference on Corizon's part because it does not show that the policy was the "moving force" behind the individual Defendants' actions. Grund argues that all of the treatment decisions regarding her breast implants were made by Dr. Hinchman and that other prison doctors referred her to him when she complained about her breasts. The Court has held that Dr. Hinchman was not deliberately indifferent to Grund's serious medical needs. He evaluated her and concluded that she did not need an MRI or other examination or treatment for her breast implants. There is no evidence to raise an inference that Dr. Hinchman was deterred by any policy in making such a recommendation, only that he did not do so based on his medical judgment. Corizon is therefore entitled to summary judgment on Grund's claims. For the same reason, any claim against Dr. Hinchman and Murphy in their official capacities must be dismissed because these claims are duplicative of the claims against Corizon. *See Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978); *DeGenova v. Sheriff of DePage County*, 209 F.3d 973, 974 n.1 (7th Cir. 2000) (a claim against an individual in his or her official capacity is the same as a claim against the entity of which the person is an agent).

## IV. CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment, (Filing No. 36), is **GRANTED**. Judgment consistent with this Entry shall now issue.

**SO ORDERED.**

Date: 9/6/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Electronic distribution to counsel of record via CM/ECF and by U.S. mail to:

SUSAN GRUND
941457
MADISON CORRECTIONAL FACILITY
800 Bus Stop Dr
Madison, IN 47250